**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 68, AFL-CIO, et al., | : | |
| Plaintiffs, | : | |
| v. | : | No. 11-3932 (MAS) (TJB) |
| RAC ATLANTIC CITY HOLDINGS, LLC, et al., | : | |
| Defendants. | : | |
| NEW JERSEY REGIONAL COUNCIL OF CARPENTERS, et al., | : | |
| Plaintiffs, | : | |
| v. | : | No. 11-4585 (MAS) (TJB) |
| RAC ATLANTIC CITY HOLDINGS, LLC, et al., | : | **MEMORANDUM OPINION** |
| Defendants. | : | |

**SHIPP, District Judge**

These cases arise out of the near failure of the Atlantic City Resorts Casino Hotel ("Resorts") located in Atlantic City, New Jersey, and the effects of several transactions related thereto. The International Union of Operating Engineers (the "Engineers") and the New Jersey Regional Council of Carpenters (the "Carpenters") (collectively, "Plaintiffs"), represent certain employees at Resorts. On July 7 and August 4, 2011, the Engineers and the Carpenters,

respectively, along with their associated welfare, pension, apprentice training and annuity funds, filed separate complaints against Resorts International Hotel ("RIH") and Resorts Atlantic City Holdings, LLC ("RAC") (collectively, "Defendants"), which for a period of time, co-operated Resorts. (Complaints, 11-3932 ECF No. 1; 11-4585 ECF No. 1.) Both of those Complaints were dismissed without prejudice as to RAC by the Honorable Freda L. Wolfson, U.S.D.J. ("Judge Wolfson"), on February 14, 2012. (11-3932 ECF No. 28-29, 11-4585 ECF No. 31-32.) As part of those decisions, Judge Wolfson granted Plaintiffs leave to amend their Complaints.

Plaintiffs' First Amended Complaints were filed on March 2, 2012. (11-3932 ECF No. 30, 11-4585 ECF No. 33.) RAC filed Motions to Dismiss the Amended Complaints on March 30, 2012. (11-3932 ECF No. 34; 11-4585 ECF No. 38.) On May 23, 2012, Plaintiffs filed Opposition to RAC's Motions to Dismiss and filed Cross Motions for Leave to File Second Amended Complaints. (11-3932 ECF No. 43, 11-4585 ECF No. 47.) RAC submitted its Opposition to the Cross Motions and Reply on July 30, 2012. (11-3932 ECF No. 49; 11-4585 ECF No. 53.) The Court has carefully considered the Parties' submissions and decided the matter without oral argument pursuant to Federal Rule of Civil Procedure ("Rule") 78. For the reasons stated below, and good cause shown, RAC's Motions to Dismiss are GRANTED and Plaintiffs' Motions for Leave to Amend are GRANTED IN PART and DENIED IN PART.

## I.     Background

### A.     Procedural History

Plaintiffs' initial Complaints alleged that Defendants breached the terms of the Parties' respective collective bargaining agreements ("CBAs") and violated various provisions of the Employment Retirement Income Security Act ("ERISA"), the Labor Management Relations Act ("LMRA") and the Federal Arbitration Act ("FAA"). These alleged violations flowed from

2

Defendants' alleged failure to (1) pay employees at RIH contractually bargained for vacation time, (2) make contractually required contributions to each union's respective pension and annuity funds, (3) implement an arbitration award benefiting Plaintiffs, and (4) pay the "withdrawal liability" due to Plaintiffs' pension funds pursuant to § 4201 of ERISA, codified at 29 U.S.C § 1381 (2012).[1]

On October 28, 2011, RAC filed motions to dismiss pursuant to Rule 12(b)(4) and 12(b)(5). (RAC's Initial Motions to Dismiss, 11-3932 ECF No. 16; 11-4585 ECF No. 18.) Those motions argued that RAC, which is a *cancelled* limited liability company, is unable to be served with a summons and that the Court therefore lacked jurisdiction over RAC. Judge Wolfson granted those motions on February 14, 2012. (Wolfson Op., 11-3932 ECF No. 28; 11-4585 ECF No. 31.) Judge Wolfson, however, dismissed the complaints *without* prejudice and granted Plaintiffs leave to amend their Complaints to reflect arguments they raised solely in their briefing papers, namely whether RAC's cancellation as an LLC should be voided pursuant to § 4212(c) of ERISA. (*Id.* 9-10.) Plaintiffs filed their Amended Complaints on March 2, 2012. (First Amended Complaints, 11-3932 ECF No. 30, 11-4585 ECF No. 33.) The Engineers' First Amended Complaint contains eight counts. The Carpenters' First Amended Complaint contains thirteen counts.

On March 30, 2012, RAC responded by filing Motions to Dismiss both First Amended Complaints pursuant to Rule 12(b)(4) and 12(b)(5). Plaintiffs responded on May 23, 2012, by filing opposition and cross-moving for leave to file Second Amended Complaints. The proposed

---

[1] "Withdrawal liability" arises when an employer withdraws from a multiemployer pension plan and the employer has not fully funded its employees' vested benefits with the plan. *See* 29 U.S.C. §§ 1381, 1391; *SUPERVALU, Inc. v. Bd. of Trs. of Sw. Pa. & W. Md. Area Teamsters & Emp'rs. Pension Fund*, 500 F.3d 334, 336 (3d Cir. 2007), *cert. denied*, 128 S. Ct. 1231 (2009).

Second Amended Complaints both contain additional counts that: 1) RAC's cancellation should

be nullified under New Jersey state law, and 2) Plaintiffs should be entitled to pierce the corporate

veil of RAC. (Pls.' Proposed Second Amended Compls., 11-3932 ECF No. 40-3, Ex. B ¶¶ 95-112;

11-4585 ECF No. 44-3, Ex. A ¶¶ 126-136.) RAC's reply and opposition were filed on July 30,

2012.

## B.    Factual History[2]

The factual allegations in both First Amended Complaints are substantially the same.[3]

Resorts is a casino and hotel located in Atlantic City, New Jersey, which has been in continuous

operation since 1978.[4] (11-3932 Compl. ¶ 11.) Plaintiffs are unions, and their associated funds,

which represent workers at Resorts. (*Id.* ¶¶ 1-10.) RIH was the owner of Resorts from April 25,

---

[2] RAC, throughout its briefing papers, references the declaration of Paul M. O'Gara ("O'Gara Declaration"). That declaration was submitted in 10-5996 (ECF No. 26-2) and 10-6072 (ECF No. 22-2), both of which were handled by the Honorable Jerome B. Simandle, U.S.D.J. ("Judge Simandle"), and are discussed more below. The O'Gara Declaration was not submitted or attached to any documents in the current cases or regarding the current motions. The Court will not address or consider the factual averments made in the O'Gara Declaration. There is no basis upon which the Court may take notice of the facts contained in a declaration submitted in a separate action, regardless of whether the parties are the same here as they were before Judge Simandle. Moreover, the fact that the O'Gara Declaration was submitted on the public docket does not render it a "public record" for purposes of whether the Court may consider it without converting RAC's motions to dismiss into motions for summary judgment, regardless of the fact that the declaration cites to public records for support of some of the contentions therein. *See generally Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1197 (3d Cir. 1993). Consideration of the O'Gara Declaration would necessitate converting RAC's motions to dismiss into ones for summary judgment; an action RAC has seemingly attempted to avoid. (*See* RAC Opening Br. 5 n. 4.) As such, it will be disregarded.

[3] The Court notes that there is a typographical error in the 11-4585 First Amended Complaint in paragraphs twelve and thirteen which makes the numbering of the ensuing paragraphs off by one number as compared to the 11-3932 First Amended Complaint. The substance, however, between the 11-3932 and 11-4585 First Amended Complaints is identical (other than the brief sections regarding obligations under the Parties' respective collective bargaining agreements) through paragraph fifty-seven and fifty-eight, respectively.

[4] Due to the aforementioned numbering errors, and for purposes of brevity and consistency unless otherwise noted, the factual background will only cite to the 11-3932 First Amended Complaint.

4

2001, until December 16, 2009. (*Id.* ¶ 12.) In order to finance its operations, RIH had a credit facility which was serviced by Trimont Real Estate Advisors, Inc. ("Trimont"). (*Id.* ¶ 13.) Late in 2008, RIH experienced financial difficulties and was unable to meet its obligations related to the credit facility. (*Id.* ¶ 14.) These defaults led to the New Jersey Casino Control Commission's (the "Commission") involvement in the matter. (*Id.* ¶ 15.) As a result of the Commission's intervention, it was "resolved that RIH would execute a deed-in-lieu of foreclosure and transfer fee title to all of the property on which Resorts is located, as well as improvements and other specified assets relating to Resorts, to a newly formed entity, [RAC] ("Deed-In Lieu Transaction")." (*Id.*) According to the Complaints, "Trimont [wa]s the sole manager of RAC." (*Id.* ¶ 16.)[5]

A Management Agreement (the "Management Agreement") was entered into between RIH and RAC as part of the Deed-in Lieu Transaction which outlined the terms of RIH and RAC's obligations to each other. (*Id.* ¶¶ 17-19.) According to Plaintiff, RAC, acting pursuant to the Management Agreement, exerted "total control" over RIH's budget and "had final authority on all of RIH's expenditures and costs." (*Id.* ¶ 22.) Plaintiffs allege that RAC, pursuant to the Management Agreement, had extensive control over labor and employee relations at Resorts. (*Id.* ¶¶ 24-31.)

The Carpenters and RIH were Parties to a collective bargaining agreement (the "Carpenters' CBA") that was effective through April 30, 2011. (11-4585 First Am. Compl. ¶¶ 31-33.) Pursuant to the Carpenters' CBA, "RIH was obligated to make contributions to the Welfare Fund, Pension Fund, Apprentice Training Fund and Annuity Fund on behalf of the bargaining unit

---

[5] Plaintiffs' Proposed Second Amended Complaints state that Wells Fargo Bank, N.A. was also a member of RAC. (11-3932 Second. Am Compl. ¶ 110-12; 11-4585 Second. Am. Compl. ¶ 134-36.)

employees for hours of work performed by members of the unit." (*Id.* ¶ 33.) The Carpenters' CBA further states that, "in the event of a layoff, each bargaining unit employee who was due additional accrued vacation time . . . would be compensated for that vacation time at the time of layoff." (*Id.* ¶ 34.) The Engineers and RIH are subject to two similar CBAs—the maintenance workers agreement was effective through April 30, 2011, and the entertainment workers agreement was effective through June 30, 2011. (11-3932 First Am. Compl. ¶¶ 32-37.)

In mid-November 2010, RAC and DGMB Casino, LLC ("DGMB"), entered into an asset purchase agreement "whereby DGMB agreed to purchase the assets of Resorts owned or operated by RAC." (*Id.* ¶¶ 39-40.) The liabilities of Resorts, such as payments to Plaintiffs for accrued sick time, were to remain with RIH. (*Id.* ¶ 41.) That agreement was scheduled to close on December 6, 2010. (*Id.* ¶ 40.)[6] The sale took place on December 7, 2010, at which time the employees represented by Plaintiffs were laid off. (*Id.* ¶¶ 43-44.)

Plaintiffs then allege that all of the proceeds from the sale were immediately "transferred to unknown, fictitious defendants." (*Id.* ¶ 45.) RAC, on December 14, 2010, filed its certificate of cancellation, effective that day, with the State of New Jersey. (*Id.* ¶ 46.) Plaintiffs allege this series of transactions was undertaken by RAC "with the purpose and intent of defrauding its creditors, including Plaintiffs." (*Id.* ¶ 47.)

---

[6] On November 17, 2010, the Carpenters filed an action in the District of New Jersey–Camden Vicinage, which sought to enjoin the pending sale to DGMB. (Civil Action No. 1:10-cv-5996, ECF No. 1.) A similar action was filed by the Engineers on November 19, 2010. (Civil Action No. 1:10-cv-6072, ECF No. 1.) Plaintiffs' applications for temporary restraints and a preliminary injunction were resolved by Judge Simandle on November 23 and 24, 2010. (Civil Action No. 1:10-cv-5996, ECF No. 7-8.) Plaintiffs' applications were denied. (*Id.*, ECF No. 9.) Judge Simandle stated in his oral opinion that Plaintiffs had failed to meet their burden and that he didn't "see a basis for interfering with the December 6th sale." (Simandle Op. 16:20-21, November 24, 2010, 10-5996 ECF No. 14.) Both cases were voluntarily dismissed in early April 2011.

Plaintiffs contend that the layoffs triggered RIH's obligation to pay employees for accrued vacation time and to pay fringe benefit contributions to Plaintiffs' associated funds. (11-3932 First Am. Compl. ¶¶ 48-50; 11-4585 First Am. Compl. ¶¶ 47-48.) The Carpenters' First Amended Complaint also alleges that "as a result of RIH's complete withdrawal from the Pension Fund, RIH was obligated to pay withdrawal liability to the Pension Fund, pursuant to § 4201(a) of ERISA, 29 U.S.C § 1381(a)." (11-4585 First Am. Compl. ¶ 49.)

Following RIH's failure to pay, Plaintiff instituted several arbitration proceedings. Those proceedings were successful. As noted by Judge Wolfson, "[i]n sum, RIH is a party to three collective bargaining agreements with Plaintiffs, and four grievance obligation awards found that RIH breached its contractual allegations." (Wolfson Op. 6-7, 11-3932 ECF No. 28.)

The Engineers allege RAC and RIH were a "Joint Employer" or "Single Employer" and should therefore be held liable for RIH's violations of the CBAs under LMRA § 301 and ERISA § 515. (11-3932 First Am. Compl. ¶ 75-88.) The Engineers further allege that RAC's sale of Resorts' assets was a fraudulent conveyance in violation of N.J. Stat. Ann. § 25:2-20, *et seq.* (*Id.* ¶¶ 89-95.)

The Carpenters allege that RAC and RIH were a "Joint Employer" or "Single Employer/Alter Ego" and should therefore be held liable for RIH's violations of the CBAs under LMRA § 301, ERISA § 515, and for failure to pay its withdrawal liability under ERISA § 4201(a). (11-4585 First Am. Compl. ¶¶ 92-112.) The Carpenters also allege that RAC's sale of Resorts' assets was a fraudulent conveyance in violation of N.J. Stat. Ann. § 25:2-20, *et seq.* (*Id.* ¶¶ 113-19.) Finally, the Carpenters allege that RAC's asset transaction with DGMB, and RAC's ensuing cancellation, had a "principal purpose of evading or avoiding withdrawal liability within the meaning of § 4212(c) of ERISA, 29 U.S.C. § 1392(c)." (*Id.* ¶¶ 120-21.)

7

## II.   Analysis

The main issue presented in this case revolves around a single concept: service of process upon a cancelled New Jersey Limited Liability Company ("LLC"). At the most basic level, and as agreed to by the Parties, service upon such a cancelled entity cannot occur and the Court therefore lacks personal jurisdiction over RAC. Plaintiffs propose two methods to cure this defect.

First, the Carpenters' First Amended Complaint alleges that the cancellation of RAC, which took place on December 14, 2010, should be set aside pursuant to § 4212(c) of ERISA and the Multiemployer Pension Plan Amendments Act ("MPPAA"). As noted before, Judge Wolfson granted leave to Plaintiffs so that they could amend their complaints to allege facts which might bring RAC's actions within the ambit of § 4212(c) of ERISA, thereby vacating the underlying transaction, RAC's cancellation, or both. (Wolfson Op. 9-10.) Only the Carpenters' First Amended Complaint was amended to include such claims.[7] The Engineers failed to allege withdrawal liability or the implication of § 4212(c) of ERISA in its First Amended Complaint. As such, the Engineers' First Amended Complaint is dismissed without prejudice because it fails to allege a basis upon which to affect service upon RAC.[8] As explained more fully below, the Court chooses not to adopt the Carpenters' argument that § 4212(c) may be utilized to make RAC amendable to service. As such, the Carpenters' First Amended Complaint will also be dismissed without prejudice.

---

[7] Both Proposed Second Amended Complaints include such allegations. Those Proposed Amended Complaints, and Plaintiffs' respective motions to amend, will be dealt with below.

[8] Dismissal with prejudice due to insufficiency of process is not appropriate. See *In re S. African Apartheid Litig.*, 643 F. Supp. 2d 423, 431-32 (S.D.N.Y. 2009) ("Absent perfected service, a court lacks jurisdiction to dismiss an action with prejudice; therefore dismissal pursuant to Rule 12(b)(5) must be without prejudice.").

Second, and featured in both of Plaintiffs' proposed Second Amended Complaints ("Second Amended Complaint"), Plaintiffs argue that RAC, by failing to adequately wind up its business, as required by N.J. Stat. Ann. §§ 42:2B-48-51 (2012),[9] should have its cancellation nullified. Upon nullification, Plaintiffs would then be able to effectuate service and pursue its case, including various charges against members of RAC, including Wells Fargo. This claim is futile. Plaintiffs' motions seeking to add claims which request to pierce the veil of RAC and hold its members accountable, however, are granted.

### A. RAC's Motion to Dismiss the Carpenters' First Amended Complaint

Service of process, or the lack thereof, is the fulcrum around which this case revolves. The Rules require service of the summons, along with the complaint, upon the defendant individually, at the defendant's "dwelling or place of abode," or by "delivering a copy of each to an agent authorized by appointment or by law to receive service of process." Fed. R. Civ. P. 4(c), (e). "The party asserting the validity of service bears the burden of proof on that issue." *Grand Entm't Grp. v. Star Media Sales*, 988 F.2d 476, 488 (3d Cir. 1993). Lack of service of process is grounds for dismissal of the complaint. Fed. R. Civ. P. 12(b)(5).

A district court, "[u]pon determining that process has not been properly served on a defendant" and that there is no "reasonable prospect that service may yet be obtained," "possess[es] broad discretion to [] dismiss the Plaintiffs' complaint for failure to effect service . . .

---

[9] New Jersey's LLC act in existence when the alleged actions took place was repealed by the REVISED UNIFORM LIMITED LIABILILTY COMPANY ACT, 2012 NJ Sess. Law Serv. Ch. 50 (ASSEMBLY 1543) (WEST 2012). That Revised Act was approved on September 19, 2012. The Revised Act will not be discussed in this opinion because, in New Jersey, courts are prohibited from giving a newly passed statute retroactive application unless the Legislature clearly intended such. *Phillips v. Curiale*, 128 N.J. 608, 616 (N.J. 1992) (citing *La Parre v. Y.M.C.A.*, 30 N.J. 225 (N.J. 1959)). Here, § 90 of the Revised Act states that "[t]his act does not affect an action commenced, proceeding brought, or right accrued before this act takes effect."

." *Umbenhauer v. Woog*, 969 F.2d 25, 30 (3d Cir. 1992). Stated differently, "[e]ffective service of process is therefore a prerequisite to proceeding further in a case." *Lampe v. Xouth, Inc.*, 952 F.2d 697, 701 (3d Cir. 1991) (citing *Arrowsmith v. United Press Int'l*, 320 F.2d 219, 221 (2d Cir. 1963)). As explained more fully below, the Carpenters have been unable to serve RAC and there is no reasonable prospect that service will be affected. As such, the Carpenters' First Amended Complaint will be dismissed without prejudice.[10]

RAC was an LLC organized under the New Jersey LLC Act. (11-3932 First Am. Compl. ¶ 8; *see generally* N.J. Stat. Ann. §§ 42:2B-1, *et seq.* (2012)). Its certificate of formation was cancelled on December 14, 2010. (11-3932 First Am. Compl. ¶ 46.) At that point in time, RAC was no longer amenable to service of process via its registered agent. *See* N.J. Stat. Ann. 42:2B-50(b). Moreover, RAC has not waived its right to process. These facts remain as they were before Judge Wolfson.

The Carpenters argue that the Court should utilize § 4212(c) of ERISA, codified at 29 U.S.C. § 1392(c), to vacate RAC's cancellation. Section 4212(c) was passed as part of the MPPAA. "The MPPAA was enacted 'out of a concern that ERISA did not adequately protect multiemployer pension plans from the adverse consequences that result when individual employers terminate their participation or withdraw.'" *SUPERVALU, Inc. v. Bd. of Trs. of Sw. Pa. & W. Md. Area Teamsters & Emp'rs. Pension Fund*, 500 F.3d 334, 336 (3d Cir. 2007) (quoting *Warner-Lambert Co. v. United Retail & Wholesale Emp.'s Teamster Local No. 115 Pension Plan*, 791 F.2d 283, 284 (3d Cir. 1986)), *cert. denied*, 128 S. Ct. 1231 (2009). To that end, the MPPAA created the concept of withdrawal liability, which was "designed to prevent employers from

---

[10] As noted earlier, the Engineers' First Amended Complaint fails to even allege a violation of ERISA § 4212(c), thereby lacking any legal theory upon which the lack of service upon RAC can be cured. As such, it too is dismissed without prejudice.

withdrawing from a multiemployer pension plan without paying their share of unfunded, vested benefit liability, thereby threatening the solvency of such plans." *Id.* (quoting *Mfrs. Indus. Relations Ass'n v. E. Akron Casting Co.*, 58 F.3d 204, 205 (6th Cir. 1995)). Withdrawal liability under the "MPPAA requires that a withdrawing employer pay its share of the plan's unfunded liability . . . [so] the financial burden will not be shifted to the remaining employers." *Id.* at 337 (internal citations and quotation omitted). The computation of withdrawal liability is covered by various sections of the MPPAA. *See* 29 U.S.C. § 1391. That analysis is not relevant to this motion.

Section 4212(c) of ERISA states: "If a principal purpose of any transaction is to evade or avoid liability under this part, this part shall be applied (and liability shall be determined and collected) without regard to such transaction." 29 U.S.C. § 1392. Essentially, this section allows an effected plan, as well as the courts, to set aside a transaction engaged in by a withdrawing employer if that transaction was entered into "with a principal purpose of escaping its duty to pay withdrawal liability" to the plan or fund. *SUPERVALU*, 500 F.3d at 341. Section 4212(c), however, does not impose a duty of good faith on the employer. *Id.* (distinguishing *Dorn's Transp., Inc. v. Teamsters Pension Trust Fund of Phila. & Vicinity*, 787 F.2d 897 (3d Cir. 1986)). Rather, "§ 4212(c) is violated when one of the main reasons for entering a transaction is to" escape liability. *Id.*

The facts of *SUPERVALU* are instructive in this case. The withdrawing employer in *SUPERVALU* was a party to a CBA with its unionized employees which required it to contribute to a "defined benefit multiemployer pension plan governed by ERISA." *Id.* at 337. The employer had a CBA which was scheduled to run through January 31, 2003. *Id.* At the beginning of 2002, the employer decided to close one of its unionized facilities. *Id.* This closing would result in the layoff of all of the unionized employees at that facility and would take place in late summer of

11

2002. *Id.* Upon announcing its intentions to close the facility, the employer and the union engaged in a series of negotiations. *Id.* "Potential withdrawal liability" was a part of those negotiations. *Id.* Specifically, if the employer were able to withdraw from the CBA "prior to June 30, 2002, the end of the Fund's 2001-2002 plan year, it would incur no withdrawal liability because the Fund did not have any unfunded vested benefits at the end of the prior plan year (2000-2001)." *Id.* If withdrawal took place following June 30, 2002, however, the employer "would incur significant withdrawal liability based on the unfunded vested benefits that would exist at the end of the 2001-2002 plan year." *Id.* at 338. The employer estimated withdrawal liability to be somewhere between $1 million to $1.5 million. *Id.*

The union agreed to the employer's proposed agreement, and per the terms of a "Termination Agreement" signed in May 2002, the prior CBAs would be terminated at 11:59 p.m. on June 29, 2002. *Id.* In consideration for its consent to the Termination Agreement, the union's members received severance payments of $2,600, and those members who continued to work for the employer past June 30, 2002, "would receive a $2.50 per hour salary increase." *Id.* The employer made its final payment to the fund on June 26, 2002, and the facility was closed on July 27, 2002. *Id.* at 338-39.

The union's pension fund contacted the employer in February 2003 and demanded payment of over $4 million dollars in withdrawal liability on the basis that the employer "entered the Termination Agreement with a principal purpose of evading or avoiding withdrawal liability in violation of ERISA § 4212(c)." *Id.* The employer disputed the fund's description of the transaction and brought the matter to arbitration. *Id.* at 339.

The arbitrator agreed with the fund's description of the transaction and granted summary judgment on the matter. *Id.* The employer filed a complaint in Western District of Pennsylvania

12

seeking to modify the arbitration award. *Id.* The district court, overturning the arbitrator and adopting the report and recommendation of a magistrate judge, held that "where it is not clear that an employer acted to evade or avoid, but rather acted to minimize, withdrawal liability, the court would not interfere." *Id.* at 340. The district judge further found that allowing the fund to determine the date of withdrawal via § 4212(c), regardless of the terms of the CBA as amended by the Termination Agreement, which therefore ended the employer's obligation to contribute per § 4212(a), ran contrary to the "entire statutory scheme," and usurped power which belonged solely to Congress. *Id.*

The Court of Appeals reversed and remanded the matter to the district court to enforce the arbitrator's award. The Third Circuit noted that the "terms transaction, evade, and avoid are not defined in the statute, and therefore we must construe them in accordance with their ordinary and natural meaning, . . . and the overall policies and objectives of the statute." *Id.* at 340-41 (internal citations and quotations omitted). The court interpreted the statute to apply "when a contributing employer enters a transaction with a principal purpose of escaping its duty to pay withdrawal liability to the plan or fund." *Id.* at 341. Applied to the facts before it, the *SUPERVALU* court found that "[t]here is no doubt that [the employer] had the intent required by the statute" and that "the only reason that [the employer] chose to renegotiate the CBAs" was "to avoid withdrawal liability . . . ." *Id.* at 341-42. The actions of the employer "violated not only the plain language of the statute, but also its purpose." *Id.* at 342. The court found that, because it was compelled to "ignore to the Termination Agreement, the prior CBAs govern [the employer's] obligation to contribute." *Id.* at 342-43. The employer, therefore, was forced to pay the full withdrawal liability. *Id.* at 344.

The finding in *SUPERVALU*, namely that the actions of an employer can result in a court voiding a transaction when a primary motive of that transaction was to avoid withdrawal liability, comports with the clear language of the statute and has been supported and echoed by many courts. *See Sherwin-Williams Co. v. N.Y. State Teamsters Conference Pension, Ret. Fund*, 158 F.3d 387 (6th Cir. 1998) (parent corporation sold subsidiary to underfunded entity and subsidiary quickly went bankrupt; sale transaction deemed voided by § 4212(c) because principal purpose was to avoid liability), *cert. denied*, 526 U.S. 1017 (1999); *Santa Fe Pac. Corp. v. Cent. States, Se. and Sw. Areas Pension Fund*, 22 F.3d 725, 729 (7th Cir. 1994) (employer's choice to sell a subsidiary's stock, rather than assets, was structured to avoid withdrawal liability and was therefore void), *cert. denied*, 513 U.S. 987; *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049 (2d Cir. 1993) (structuring an asset sale to avoid withdrawal liability on the part of the seller or purchaser deemed void), *cert. denied*, 513 U.S. 822 (1994).

The Carpenters rely upon these cases, amongst others, as a basis for its assertion that RAC's cancellation should be voided by the Court in order to effectuate proper service. (Carpenters' Br. 17.) Those pleas are unavailing. None of the cases cited by the Carpenters allow the Court to grant the remedy it desires.

As noted earlier, service of proper process is a lynchpin of the Rules and the adversarial system. The Carpenters have failed to cite any cases in which a district court has, without the consent of the prospective defendant, waived the service requirement. The Carpenters have also failed to present any cases in which a cancelled entity, unamenable to service, had been resurrected so that service could be affected and the case could proceed.

The cases cited by the Carpenters do not provide the support the Court requires to depart so drastically from settled practice. *SUPERVALU*, *Sherwin-Williams*, *Santa Fe*, and *Herrmann* all

14

dealt with the invalidation of the underlying transaction. While the facts as alleged in the Carpenters' First Amended Complaint, taken as true, may be sufficient to allege that RAC (and any entity to which assets where fraudulently or impermissibly transferred) was engaged in a transaction whose primary purpose was to evade withdrawal liability, the Carpenters request a wholly different level of relief. They ask for an ensuing event, RAC's cancellation, to be set aside. This distinction is not academic or insubstantial. Vacating an asset sale, and holding those Parties liable for it, when those parties are properly before the court and jurisdiction over them is not in dispute, is clearly allowed by the plain language of the statute and the policy underlying the MPPAA. It is another thing altogether for a district court to invalidate events secondary to the underlying and disputed transaction. Moreover, and as noted earlier, no court has held the cancellation of an LLC to be the type of event that should be considered a transaction for purposes of § 4212(c). Simply stated, the Court does not find that RAC's cancellation falls within the category of transactions covered by § 4212(c). As such, the Carpenters' First Amended Complaint must be dismissed without prejudice because RAC remains a cancelled LLC upon which service cannot be made.

**B.    Plaintiffs' Motions for Leave to File Second Amended Complaints**

Plaintiffs' Second Amended Complaints are similar to the first except they add two additional counts. The first additional count seeks "nullification" of RAC's cancellation pursuant to N.J. Stat. Ann. 42:2B-14. (11-3932 Second Am. Compl. ¶¶ 102-08; 11-4585 Second Am. Compl. ¶¶ 126-32.) The second additional count seeks to pierce RAC's corporate veil. (11-3932 Second Am. Compl. ¶¶ 109-112; 11-4585 Second Am. Compl. ¶¶ 133-36.)

Pursuant to Rule 15(a)(2), once a response to a party's pleading is served and twenty-one (21) days have elapsed, that pleading may be amended only by leave of the court or by written

consent of the adverse party. Leave to amend a pleading should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). A general presumption exists in favor of allowing a party to amend its pleadings. *See Boileau v. Bethlehem Steel Corp.*, 730 F.2d 929, 938 (3d Cir. 1984) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962), *cert. denied,* 469 U.S. 871 (1984)). Such an approach ensures that a claim will be decided on the merits rather than on technicalities. *Dole v. Arco Chem. Co.*, 921 F.2d 484, 487 (3d Cir. 1990) (citations omitted).

Such liberality, however, is not limitless and there are several factors which weigh against granting leave to amend. Those factors include undue delay, bad faith, undue prejudice and futility of amendment. *Id.* at 487 (citing *Foman*, 371 U.S. at 182).

Leave to amend a complaint should be granted freely in the absence of undue delay or bad faith on the part of the movant as long as the amendment would not cause the opposing party to suffer undue prejudice. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Adams v. Gould Inc.*, 739 F.2d 858, 864 (3d Cir. 1984), *cert. denied*, 469 U.S. 1122 (1985). Futility of amendment is defined as the inability to survive a motion to dismiss. *Oran v. Stafford*, 226 F.3d 275, 291 (3d Cir. 2000). Therefore, evaluating futility involves application of the same standard of legal sufficiency that is applied under Rule 12(b)(6). RAC has opposed Plaintiffs' motions for leave to amend on the grounds of futility.

A district court conducts a three-part analysis when considering a Rule 12(b)(6) motion. *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). "First, the court must 'take note of the elements a plaintiff must plead to state a claim.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Second, the court must accept as true all of a plaintiff's well-pleaded factual allegations and construe the complaint in the light most favorable to the plaintiff. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). The court, however, must disregard any conclusory

16

allegations proffered in the complaint. *Id.* For example, the court is free to ignore legal conclusions or factually unsupported accusations which merely state that "the-defendant-unlawfully-harmed-me." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Finally, once the well-pleaded facts have been identified and the conclusory allegations ignored, a court must next determine whether the "facts alleged in the complaint are sufficient to show that plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679). Determining plausibility is a "context-specific task which requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Plausibility, however, "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 545). In the end, facts which only suggest the "mere possibility of misconduct" fail to show that the plaintiff is entitled to relief. *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679).

Essentially, Plaintiffs allege that RAC, by failing to wind up and dissolve the company according to law, should have its cancellation revoked by the Court, thereby allowing Plaintiffs to serve RAC. As a basic matter, New Jersey's LLC Act does not allow cancelled entities to be served, prosecute or defend suit. *See* N.J. Stat. Ann. § 42:2B-50(b) ("[*U*]*ntil* the filing of a certificate of cancellation as provided in section 14 of this act, the persons winding up the limited liability company's affairs may, in the name of, and for and on behalf of, the limited liability company, prosecute and defend suits, whether civil, criminal or administrative . . . .") (emphasis added). Plaintiffs assert, however, that the cancellation filed by RAC should be nullified because RAC failed to wind down its business in accordance with N.J. Stat. Ann. § 42:2B-51, which outlines the process by which creditors, such as Plaintiffs' funds, are paid. Plaintiffs state that

RAC's failure to properly wind up its business, and pay its creditors, renders RAC's cancellation a nullity because an LLC should only be "canceled upon the dissolution and the completion of winding up of a limited liability company." *See* N.J. Stat. Ann. § 42:2B-14.

Plaintiffs rely upon an opinion from the Chancery Court in Delaware for the position that the cancellation of an LLC can be nullified. *See Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 139 (Del. Ch. 2004). No New Jersey court has resolved the matter. Moreover, the *Metro* court did not engage in a detailed analysis stating why it thought it was appropriate to graft such a remedy onto Delaware's LLC Act when the Act was otherwise silent on the issue. The Court is not persuaded to follow the ruling in *Metro*.

A more recent case decided by the Supreme Court of Washington is both more persuasive and on point. *See Chadwick Farms Owner's Ass'n v. FHC LLC*, 166 Wash. 2d 178 (Wash. 2009). In that case, the court, interpreting the Washington LLC Act, found that a cancelled LLC lacks the ability to be sued.[11] *Id.* at 183. In *Chadwick*, the defendant LLC had dissolved with the consent of its members and filed a certificate of cancellation.[12] *Id.* at 185. Five months later, it was sued, including claims to "pierce the corporate veil" of the LLC. *Id.* After a detailed analysis of the Washington LLC Act, which as noted tracks New Jersey's LLC Act, the *Chadwick* court held that "there is a clear distinction between dissolution and cancellation. A dissolved company still exists for the purpose of winding up, during which it can sue or be sued. *But once a limited liability company's certificate of formation is canceled, it no longer exists as a separate legal entity for*

---

[11] Washington's LLC Act, at the time *Chadwick* was decided, contained the exact same language as New Jersey's pre-2012 LLC Act. *Compare* Wash. Rev. Code. § 25.15.295 (2009) *with* N.J. Stat. Ann. § 42:2B-50(b) (both of which were based upon the Uniform Limited Liability Company Act).

[12] This Opinion discusses the latter of the two cases actually adjudicated in *Chadwick*. The first of the two cases is factually inapposite to the case before the Court.

*any purpose.*" *Id.* at 194-95 (emphasis added). As such, the court found no reason that it should

apply a separate statute which held that a dissolved LLC remained viable for three years following

the LLC's dissolution. *See* Wash. Rev. Code Ann. § 25.15.303 (2012). The *Chadwick* court found

that the presence of that statute did not overcome the fact that the LLC in question had been

cancelled. *Chadwick* at 192. A cancelled LLC was, *per se*, barred from being sued; it was to be

considered a non-existent entity. *Id.* at 190. The Court is persuaded to follow the reasoning in

*Chadwick* when construing New Jersey's LLC statute.

　　Moreover, binding precedent in the area of statutory interpretation and *sua sponte* creation

of new causes of action require the Court to defer to the plain language of the New Jersey LLC

Act, which does not provide for nullification of an LLC. The Supreme Court has held that "[t]he

federal judiciary will not engraft a remedy on a statute, no matter how salutary, that Congress did

not intend to provide." *California v. Sierra Club*, 451 U.S. 287, 297 (1981); *see also State of N.J.,*

*Dept. of Envtl. Prot. & Energy v. Long Island Power Auth.*, 30 F.3d 403, 421 (3d Cir. 1994)

("Where a statute does not explicitly create a right of action for a particular party, a court may find

such a right implied only where it can confidently conclude Congress so intended."). The

improvidence of the creation of such a right, without clear indication of such in the statute, does

not comport with *Sierra Club* or *Long Island Power*.

　　Finally, and as noted by RAC, the New Jersey legislature had the choice to create such a

right of action but chose not to. *Compare* N.J. Stat. Ann. § 42:2B-50 (prohibiting suits against an

LCC following its cancellation) *with* N.J. Stat. Ann. § 14A:12-9(2)(e) (a provision in New

Jersey's Corporation Act which allows legal actions "by and against the corporation in the same

manner [after it has been dissolved] as if dissolution did not occur."); *see also Johnson v. Four*

*States Enters., Inc.*, 355 F. Supp. 1312, 1318 (E.D. Pa. 1972), *aff'd,* 495 F.2d 1368 (3d Cir. 1974)

("[U]nder New Jersey Law, a corporation after dissolution may be sued for a cause of action in tort [or contract] arising before such dissolution, and process may be served on the registered agent of the corporation.") (citing *Hould v. John P. Squire & Co.*, 81 N.J.L. 103 (N.J. 1911)).

For the foregoing reasons, Plaintiffs' claims contained in their Second Amended Complaints which seek to nullify RAC's cancellation and render RAC amenable to suit are deemed futile because they lack a legally cognizable basis. RAC is dismissed without prejudice from this case due to an inability to be served.

### C.    Plaintiffs' Proposed Piercing the Corporate Veil Claims against Wells Fargo

Plaintiffs move to amend their First Amended Complaints to add a count seeking to pierce the corporate veil of RAC and add Wells Fargo Bank, N.A. ("Wells Fargo"), to this case. That motion is granted. The claims allege that "RAC was improperly wound up in contravention of the New Jersey Limited Liability Company Act." (11-3932 Second. Am Compl. ¶ 110; 11-4585 Second Am. Compl. ¶ 134.) The failure to wind up RAC allegedly makes Wells Fargo "therefore individually liable for RAC's debts and obligations." (11-3932 Second. Am Compl. ¶ 111; 11-4585 Second Am. Compl. ¶ 135.) Plaintiffs allege that "Wells Fargo used RAC to violate its duties and obligations and caused Plaintiffs to suffer damages." (11-3932 Second. Am Compl. ¶ 112; 11-4585 Second Am. Compl. ¶ 136.) As a result of this alleged behavior, Plaintiffs seek judgment against Wells Fargo for: 1) all violations of the CBA, 2) unpaid fringe benefit contributions, 3) unpaid withdrawal liability, 4) liquidated damages, 5) interest, 6) attorney's fees and costs, and 7) other legal or equitable relief deemed appropriate.

In New Jersey, although the law is unsettled, it is generally accepted that the veil of an LLC can be pierced. *See generally Brown-Hill Morgan, LLC v. Lehrer*, A-1069-08T3, 2010 WL 3184340, at *12 (N.J. Super. Ct. App. Div. Aug. 12, 2010); *Operative Plasterers & Cement*

*Masons Int'l Ass'n Local 8 v. AGJ Const., LLC*, No. 08-6163 (RMB), 2009 WL 2243900 (D.N.J. July 24, 2009); *D.R. Horton Inc. – N.J. v. Dynastar Dev., L.L.C.*, 2005 WL 1939778 (N.J. Super. Ct. Law Div. 2005); 49 N.J. Prac., Business Law Deskbook § 3:35 (2011-2012 ed.); *accord Chadwick Farms Owners Ass'n*, 166 Wash. 2d at 202 ("Members of a limited liability company who fraudulently attempt to use the provisions of the act to avoid liability and members who wind up a limited liability company improperly expose themselves to individual liability . . . .").

Taking Plaintiffs' allegations as true, solely for the purposes of this motion, and considering that leave to amend should be freely granted, Plaintiffs have alleged a cognizable claim against RAC's members that, during RAC's dissolution, RAC may have not fulfilled its duties to its creditors, including Plaintiffs. That claim is not futile. Nor would granting leave to amend unduly prejudice Wells Fargo, who would have a full opportunity to oppose such claims. In light of the foregoing, Plaintiffs are granted leave to file Second Amended Complaints which name RIH and Wells Fargo, but not RAC.

## III.   Conclusion

For the reasons stated above, the Engineers' and Carpenters' First Amended Complaints are DISMISSED WITHOUT PREJUDICE. Plaintiffs have failed to demonstrate any basis for the Court to waive the service requirement or otherwise make RAC amendable to service. Plaintiffs' Motions to file their Proposed Second Amended Complaints are GRANTED IN PART and DENIED IN PART. Those Complaints may not name RAC as a party to these cases. Plaintiffs are instructed to file their Second Amended Complaints within thirty (30) days of the filing of this Opinion. An Order consistent with this Opinion will be entered.

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

Dated: January 29, 2013

21